CR
9-19-17

PJM/CAH USAO#2015R00668

FILED
U.S. DISTRICT COURT

2017 SEP 20  PM 4: 48

C___ ___
_____

BY_____ K_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. JKB-16-363** |
| | : | |
| | : | |
| **GERALD THOMAS JOHNSON,** | : | **(Racketeering Conspiracy, 18 U.S.C.** |
|     a/k/a "Geezy," | : | **§ 1962(d); Conspiracy to Distribute** |
|     a/k/a "Gzy Tha Prince," | : | **Controlled Substances, 21 U.S.C.** |
| **WESLEY JAMAL BROWN,** | : | **§ 846; Conspiracy to Commit Murder** |
|     a/k/a "Shike White," | : | **in Aid of Racketeering, 18 U.S.C. §** |
|     a/k/a "Wes," | : | **1959(a)(5); Murder in Aid of** |
|     a/k/a "West Coast," | : | **Racketeering, 18 U.S.C. § 1959(a)(1);** |
|     a/k/a "Coasta," | : | **Use, Carry, Brandish, and Discharge** |
| **DAVID ALBERT HUNTER,** | : | **of Firearm During and in Relation to** |
|     a/k/a "Lil Dave," | : | **Crime of Violence, 18 U.S.C. § 924(c);** |
|     a/k/a "Dave," | : | **Possession with Intent to Distribute** |
| **MONTEL HARVEY,** | : | **Cocaine Base, 21 U.S.C. § 841(a)(1);** |
|     a/k/a "Telly," | : | **Possession of Ammunition by a Felon,** |
|     a/k/a "Telephone," | : | **18 U.S.C. § 922(g); Possession of a** |
|     a/k/a "Big Head," | : | **Firearm by a Felon, 18 U.S.C. §** |
| **KENNETH JONES,** | : | **922(g), Aiding and Abetting, 18** |
|     a/k/a "K-Slay," | : | **U.S.C. § 2 Forfeiture, 18 U.S.C. §§** |
|     a/k/a "Slay," | : | **924, 1963; 21 U.S.C. § 853; 28 U.S.C.** |
| **KENNETH LEE FAISON,** | : | **§ 2461)** |
|     a/k/a/ "Roscoe," | : | |
| **JOSEPH LAURENCE BONDS,** | : | |
|     a/k/a/ "Joe," | : | |
|     a/k/a "Yo Gotti," | : | |
| **NORMAN TYRONE HANDY,** | : | |
|     a/k/a "Lil Norm," | : | |
|     a/k/a "Norm," | : | |
| **MARQUISE MCCANTS,** | : | |
|     a/k/a "Digga," | : | |

        **Defendants.**

## SECOND SUPERSEDING INDICTMENT

## COUNT ONE
### (Conspiracy to Participate in Racketeering Enterprise)

### Introduction

1.      The Black Guerilla Family ("BGF"), also known as Jamaa (the Swahili word for family), or J for short, is a nationwide gang operating in prisons and on the streets of Baltimore, Maryland and other major cities throughout the United States.   Founded in California in the 1960s, BGF appeared in the Maryland correctional system in the 1990s.  In the mid-2000s, it became the dominant prison gang at the Baltimore City Detention Center and related prison facilities.  BGF members frequently brought the gang ideology to the streets when released, thereby fueling the spread of BGF outside the correctional system.  Although still a prison gang, BGF is increasingly involved in criminal activity on the streets of Baltimore, including murder, robbery, extortion, narcotics trafficking, obstruction of justice, and witness intimidation.

2.      Outside the prison system, the membership of BGF is organized into units known as "regimes" or "bubbles" that correspond to particular regions or neighborhoods in Baltimore City.  These units are organized hierarchically, with a "Commander" or "C" and various subordinates, including a "Lieutenant Commander" or "LTC"; Ministers of Finance, Defense, Justice, and Education; a Sergeant of Arms; and a Field Marshal.  Many of these subordinates have specialized functions, such as collecting dues, planning acts of violence against rival gangs or drug traffickers, implementing disciplinary measures, educating members about the gang's history and rules, or acquiring weapons for the regime.  The remaining members of the unit are designated as "in the field," and are responsible for carrying out the directives of the regime.

3.      A "Bushman," or "BM" for short, is a high-ranking, senior BGF member.  BMs oversee the activities of multiple regimes within their respective areas of the city.  BGF members often refer to BMs as being "in the Bush."  Whereas a Commander is responsible for running his particular regime, a BM might control multiple regime Commanders in the BGF hierarchy.

4.      At all times relevant to this Superseding Indictment, BGF members were required to follow a set of rules, sometimes referred to as the "22s and 33s," or, collectively, the "55s."  These were the rules by which all BGF members were governed, including, for example, a rule against cooperating with law enforcement or "snitching"; a rule against revealing the secrets of the gang; a rule against stealing from the gang; and a rule requiring the payment of dues.  BGF members who violated this code of conduct or who disobeyed an order from a superior were subject to disciplinary measures called "sanctions," which included fines, physical beatings, and death.  Snitching was considered one of the most serious violations, and was punishable by death if there was "paperwork" proving the violation.  "Paperwork" normally consisted of court documents such as a search warrant affidavit or trial transcript.

5.      At all times relevant to this Superseding Indictment, BGF members joined the gang by obtaining a "sponsor" from within the gang who would educate the prospective member (sometimes referred to as a "fox") about the gang's history, code of conduct, and oath.  In order to gain admission to the gang, prospective members were required to learn the 22s and 33s and recite the BGF oath from memory.  The BGF oath, sometimes referred to as the "two S's and three I's," is as follows: "Should I ever be untrue and forsake the chosen few, this oath shall kill me; should I ever become lax in discipline in times of strife or neglect my brothers, this oath shall kill me; if I ever sought to do harm or allow harm to come to my brothers, this oath shall

kill me; if at any time I refuse or deny to give assistance to this oath or reject my brother, this oath shall kill me; if I ever reveal the sworn secrecy of this oath, this oath shall kill me."

6.      The organization known today as the BGF Greenmount Regime is a violent regime, or "bubble," of BGF.  During the early years in which it operated, the gang consisted of mostly younger individuals, many of whom lived in the 2200, 2300, and 2400 blocks of Barclay Street and Guilford Avenue.  During this time period, the organization called itself the Young Guerilla Family, or YGF.

7.      Between mid-2005 and approximately mid-2007, YGF members sold various controlled substances, including cocaine, cocaine base, heroin, oxycodone, ecstasy and marijuana, throughout the Greenmount Avenue corridor.  They also committed murders, shootings, and armed robberies, both inside and outside their neighborhood.

8.      By mid-2007, senior BGF leaders, including Bushmen, became concerned that YGF members were recklessly engaging in violence, thereby subjecting their BGF counterparts to unwanted scrutiny from law enforcement.  To address this concern, BGF's leadership issued an ultimatum: YGF and its members could either "shut down," or, alternatively, they could embrace BGF's rules and structure by becoming full-fledged members of the gang.

9.      Following this ultimatum, nearly all YGF members took the BGF oath, resulting in a merger between the affiliated gangs.  The merger had little effect, however, on the structure and leadership of YGF, and it did nothing to stem the violence committed by members of the gang.  Following the merger, members of the BGF Greenmount Regime continued distributing narcotics and committing robberies, both armed and unarmed, to raise internal funds.  They also committed murders, shootings, and assaults to protect their territory from rival gangs and drug

4

dealers; to intimidate, and in some cases eliminate, witnesses to their criminal activity; and to maintain discipline and order within the gang.

10.     Over time, the BGF Greenmount Regime gradually assumed control over several dozen city blocks in the area of Greenmount Cemetery. By mid-2013, the gang controlled the roughly rectangular area bordered by Greenmount Avenue to the east; Guilford Avenue to the west; 25th Street to the north; and Federal Street to the south, as well as certain offshoots east of Greenmount Avenue, including Mund Park and Cokesbury Avenue.

11.     At all times relevant to this Superseding Indictment, the following defendants, among others, were members and associates of the organization known today as the BGF Greenmount regime:

**GERALD THOMAS JOHNSON,**
a/k/a "Geezy," a/k/a "Gzy Tha Prince,"
**WESLEY JAMAL BROWN,**
a/k/a "Shike White," a/k/a "Wes,"
a/k/a "West Coast," a/k/a "Coasta,"
**DAVID ALBERT HUNTER,**
a/k/a "Lil Dave," a/k/a "Dave,"
**MONTEL HARVEY,**
a/k/a "Telly," a/k/a "Telephone," a/k/a "Big Head,"
**KENNETH JONES,**
a/k/a "K-Slay," a/k/a "Slay,"
**KENNETH LEE FAISON,**
a/k/a "Roscoe,"
**JOSEPH LAURENCE BONDS,**
a/k/a "Joe," a/k/a "Yo Gotti,"
**NORMAN TYRONE HANDY,**
a/k/a "Lil Norm," a/k/a "Norm," and
**MARQUISE MCCANTS,**
a/k/a "Digga,"

### The Racketeering Enterprise

12.     At all times relevant to this Superseding Indictment, the organization known today as the BGF Greenmount Regime, including its leadership, members, and associates,

constituted an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Purposes of the Enterprise

13.     Among the purposes of the enterprise were the following:

a.      Enriching the leaders, members, and associates of the enterprise through the distribution of controlled substances, robbery, and the use of threats, intimidation, and violence, including but not limited to acts of murder and retaliation against witnesses;

b.      Promoting and enhancing the enterprise and its members' and associates' activities;

c.      Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the distribution of controlled substances, robbery, and the use of threats, intimidation, and violence, including acts of murder, witness retaliation, and assaults;

d.      Preserving and protecting the enterprise and its leaders by keeping its members and associates from cooperating with law enforcement through intimidation, violence, and threats of violence;

e.      Providing financial support and information to members, including those who were incarcerated for committing acts of violence or other offenses;

f.      Providing assistance to other gang members who committed crimes for and on behalf of the gang in order to hinder, obstruct, and prevent law enforcement officers from identifying, apprehending, and punishing the offender; and

6

g.      Keeping victims and witnesses in fear of the enterprise and in fear of its leaders, members, and associates through acts of violence and threats of violence.

## The Racketeering Conspiracy

14.     Beginning in or about 2005 and continuing until on or about the date of this Second Superseding Indictment, in the District of Maryland, and elsewhere, the defendants,

**GERALD THOMAS JOHNSON,**
a/k/a "Geezy," a/k/a "Gzy Tha Prince,"
**WESLEY JAMAL BROWN,**
a/k/a "Shike White," a/k/a "Wes,"
a/k/a "West Coast," a/k/a "Coasta,"
**DAVID ALBERT HUNTER,**
a/k/a "Lil Dave," a/k/a "Dave,"
**MONTEL HARVEY,**
a/k/a "Telly," a/k/a "Telephone," a/k/a "Big Head,"
**KENNETH JONES,**
a/k/a "K-Slay," a/k/a "Slay,"
**KENNETH LEE FAISON,**
a/k/a "Roscoe,"
**JOSEPH LAURENCE BONDS,**
a/k/a "Joe," a/k/a "Yo Gotti,"
**NORMAN TYRONE HANDY,**
a/k/a "Lil Norm," a/k/a "Norm," and
**MARQUISE MCCANTS,**
a/k/a "Digga,"

each being a person employed by and associated with the organization known today as the BGF Greenmount Regime, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with each other and with other persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as defined in Sections 1961(1) and (5) of Title 18, United States Code, which pattern of racketeering activity consisted of multiple:

      a.     Acts involving murder, chargeable under Md. Code Ann., Crim. Law §§ 2-201, 2-204, 2-205, and 2-206, and the Common Law of Maryland punishable pursuant to Md. Code Ann., Crim. Law §§ 1-201, 1-202, 2-201, 2-204, 2-205, and 2-206 (Maryland Murder);

      b.     Acts involving robbery, chargeable under Md. Code Ann., Crim. Law §§ 3-402 (Maryland Robbery), 3-403 (Maryland Robbery with a Deadly Weapon), and the Common Law of Maryland;

      c.     Offenses involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 841 (distribution of controlled substances) and 846 (conspiracy to distribute controlled substances);

      d.     Acts indictable under 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or informant); and

      e.     Acts indictable under 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or informant).

## Manner and Means of the Racketeering Conspiracy

15.    Among the manner and means by which the defendants and their associates achieved the object of the conspiracy were the following:

      a.     Members of the BGF Greenmount Regime and their associates employed and used gang-related terminology, symbols, and tattoos. They frequently identified, for example, with the numbers 2-7-6, the alphanumeric characters for BGF; as well as with the name and likeness of George Lester Jackson, a co-founder of BGF.

      b.     Members of the BGF Greenmount Regime and their associates attended meetings with other BGF gang members to discuss, among other things, the structure and

organization of the gang; past criminal acts; rival gangs and drug traffickers; the arrest or incarceration of BGF members; the enforcement of gang rules and sanctioning of BGF members; the collection of dues; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; plans and agreements regarding the commission of future crimes, including murder, robbery, the distribution of controlled substances, illegal possession of firearms, witness tampering and assault, as well as ways to conceal these crimes from law enforcement.

c.      Incarcerated members of the BGF Greenmount Regime and their associates used jail telephones to disseminate information about arrests and releases of members and associates, to publicize the identities of persons believed to be cooperating with law enforcement, and to request money from BGF members and associates who were not incarcerated.  Because they knew that jail telephone calls were recorded, members of the BGF Greenmount Regime and their associates often made calls using other inmates' account numbers in an attempt to conceal their identities.

d.      Members of the BGF Greenmount Regime and their associates agreed to purchase, maintain, and circulate weapons and firearms for use in criminal activity by BGF members.

e.      Members of the BGF Greenmount Regime and their associates used, carried, possessed, brandished, and discharged firearms in connection with the enterprise's illegal activities, including but not limited to murder, attempted murder, and robbery.

f.      Members of the BGF Greenmount Regime and their associates used violence, threats of violence, and intimidation to prevent victims and witnesses from cooperating with law enforcement against BGF regarding criminal acts committed in furtherance of the gang.

g.      Members of the BGF Greenmount Regime and their associates obstructed justice and harmed, threatened, intimidated, and in some cases murdered witnesses and victims who cooperated with law enforcement against BGF.

h.      Members of the BGF Greenmount Regime and their associates distributed and conspired to distribute controlled substances, including but not limited to heroin, cocaine, cocaine base, oxycodone, and marijuana, in the Greenmount Avenue corridor of Baltimore City.

i.      Members of the BGF Greenmount Regime and their associates controlled drug territories and generally permitted only BGF members to sell drugs in those territories. Non-BGF members who wished to distribute drugs in those territories were forced to pay a tax or were targeted for violence by BGF members.

j.      Members of the BGF Greenmount Regime and their associates paid dues to BGF leaders on a regular basis and were subject to reprisal for failure to do so.

k.      Members of the BGF Greenmount Regime and their associates earned money for their enterprise and financed their activities, including the payment of dues, through the distribution of controlled substances and the commission of armed and unarmed robberies.

l.      Members of the BGF Greenmount Regime and their associates used cellular telephones to communicate with one another concerning and during the commission of the enterprise's illegal activities.

m.      Members of the BGF Greenmount Regime and their associates attempted to conceal the purposes of the acts done in furtherance of the enterprise, and used coded language and other means to avoid detection and apprehension by law enforcement and otherwise to provide security to members and associates of the enterprise.

10

n.       Members of the BGF Greenmount Regime and their associates agreed that acts of violence, including murder, would be committed in order to protect and further the interests of BGF and to impose discipline within the gang.

## Overt Acts

16.      In furtherance of the conspiracy and to achieve the objective thereof, the defendants and others performed and caused to be performed the following acts, among others, in the District of Maryland and elsewhere:

17.      Beginning in approximately 2005 and continuing until early 2007, **JOHNSON** supplied distribution quantities of cocaine, cocaine base, heroin, and methylenedioxy-methamphetamine (ecstasy) to other YGF members, including **FAISON**, **BONDS**, **JONES**, and **HUNTER**, who in turn assisted **JOHNSON** in distributing drugs on the street.

18.      Beginning in approximately 2005 and continuing until early 2007, **JOHNSON** used a residence located at 221 E. 25th Street as a "stash house," where other YGF members, including **FAISON**, **BONDS**, and **JONES**, would store narcotics and package them for distribution.

19.      Beginning in approximately 2005 and continuing until early 2007, **JOHNSON** and other members of YGF, including **FAISON**, **JONES**, **BONDS**, and **HUNTER**, held gang meetings in the residence located at 221 E. 25th Street.

20.      On July 20, 2005, in the 200 block of E. 22nd Street, **HUNTER** shot and killed Victim D.J. using a .32 caliber revolver belonging to **BONDS**.  After the shooting, **HUNTER** attempted to return the revolver to **BONDS**.  **BONDS** initially refused, but later agreed to take the revolver back from **HUNTER**.

21.     On August 19, 2006, in the 300 block of E. 20th Street, **HUNTER**, a felon, unlawfully possessed a loaded Davis Industries .380 caliber handgun (serial number AP428040).

22.     On December 27, 2006, outside the residence located at 221 E. 25th Street, **JOHNSON** attempted to shoot Victims M.L. and S.C. because he suspected that they had stolen drugs from him.

23.     On January 9, 2007, inside the residence located at 221 E. 25th Street, **JONES** and another YGF member shot and killed Victim G.R. using the same 9mm handgun that was used to shoot a rival drug dealer five days earlier.  **JOHNSON** authorized the killing of Victim G.R. in his capacity as a leader of YGF, both because Victim G.R. was rumored to be cooperating with law enforcement and because **JOHNSON** believed that Victim G.R. had stolen drugs from him.

24.     In the days following Victim G.R.'s murder, **JOHNSON** told at least one other YGF member that the blood from Victim G.R.'s gunshot wounds looked like "spaghetti sauce."

25.     In or about the spring of 2007, **FAISON** and another YGF member robbed an unidentified male of a Standard Sentinel .22 caliber revolver.  On June 8, 2007, **FAISON's** accomplice unlawfully possessed the revolver (serial number 1419770) in the 300 block of E. 22 ½ Street.

26.     In or about mid-2007, **JOHNSON** and **HUNTER** participated in meetings with senior BGF members regarding the merger between BGF and YGF.

27.     On September 28, 2007, in the 2400 block of Brentwood Avenue, **JOHNSON** distributed cocaine base to an undercover Baltimore Police Officer.

28.     On October 2, 2007, in the 2200 block of Barclay Street, **HUNTER, FAISON**, and a third individual possessed with intent to distribute cocaine.

12

29.     On October 31, 2007, in the 2400 block of Brentwood Avenue, Victim N.K., a senior BGF member who had helped to facilitate the transition of YGF into BGF, was murdered. Following the murder, BGF members held a candlelight vigil in Victim N.K.'s honor in the area of 25th Street and Brentwood Avenue. During the vigil, a senior BGF member ordered a BGF enforcer to assemble a team to kill H.M. because H.M. was believed to have killed Victim N.K. following a dispute over drug territory near Greenmount Avenue and 25th Street. The BGF enforcer enlisted the assistance of **HUNTER**, who was carrying a firearm, and two other individuals. As the BGF enforcer, **HUNTER**, and their accomplices were driving toward H.M.'s reported location with the intent of killing H.M., the order to kill H.M. was rescinded. In the presence of at least one other person, **HUNTER** expressed disappointment about the order to stand down.

30.     On May 9, 2008, in the 2400 block of Greenmount Avenue, **MCCANTS** and two other individuals assaulted and stabbed Victim J.B.

31.     On May 17, 2008, in the 2900 block of Hargrove Alley, **MCCANTS** and two other individuals assaulted and robbed Victim M.P. at gunpoint.

32.     On June 6, 2008, in the 2200 block of Guilford Avenue, **BONDS** and another BGF member possessed with intent to distribute cocaine and possessed $390 in U.S. currency.

33.     On January 7, 2010, in the 2100 block of Barclay Street, **FAISON** robbed Victim J.P. at gunpoint. While committing the robbery, **FAISON** stated, "you know what this is—I'm robbing everybody in this neighborhood."

34.     On January 7, 2010, in the 2100 block of Barclay Street, **FAISON** robbed Victim D.S. at gunpoint.

35.     On January 7, 2010, in the 2100 block of Barclay Street, **FAISON** and **HANDY** robbed Victim E.J.  During the robbery, **FAISON** brandished a firearm and threatened to kill Victim E.J.

36.     On August 26, 2010, in the 100 block of Pheasant Drive (located in Elkton, MD) **MCCANTS** and an accomplice committed an armed home invasion robbery.

37.     On April 11, 2011, in the 900 block of E. North Avenue, **JONES** unlawfully possessed a Taurus .357 Magnum revolger, bearing serial number YB61906.

38.     On June 14, 2011, in the 2400 block of Greenmount Avenue, **HUNTER** shot and killed Victim H.M.   **HUNTER** killed Victim H.M. as retaliation for Victim H.M.'s murder of Victim N.K. in October 2007, and also because Victim H.M. (who was not a member of BGF) was selling drugs in the area of Greenmount Avenue and 25th Street without paying the requisite "tax" to BGF.

39.     Later on June 14, 2011, following **HUNTER's** murder of Victim H.M., **JOHNSON** presided over a BGF gang meeting at Mund Park in the 2300 block of Greenmount Avenue.

40.     On June 22, 2011, during a voluntary interview with police detectives, **HANDY** admitted selling drugs to support himself.

41.     On October 7, 2011, an unknown individual posted a YouTube video in which **JOHNSON** sought to enhance his status within BGF, and to intimidate potential rivals, by rapping about BGF, drug dealing and gun violence.  **JOHNSON** rapped as follows: "Consistent pulling these triggers, so don't try me … convicted felon, two warrants, I skip dates … a killer with latitude, shooter with no remorse … sell 50s of cocaine … holler at them BGF niggas that

run things." When referencing BGF, **JOHNSON** put his index finger to his lips, so as to suggest a level of secrecy regarding BGF and its membership.

42. On January 6, 2012, near the intersection of Eutaw and Lombard Streets, **JOHNSON** assaulted and robbed Victim M.V. outside The Goddess nightclub.

43. On June 29, 2012, in the 300 block of E. Lanvale Street, **HARVEY** possessed with intent to distribute cocaine.

44. On or about August 28, 2012, an unknown individual posted a YouTube video in which **JOHNSON** sought to enchance his status within BGF, and to intimidate potential witnesses, by rapping about retaliation against "snitches." The tagline for the video stated: "Catch this new song on Gzy Tha Prince—JamaaVille (reloaded)." The video featured a photo collage that included a picture of **JOHNSON** with an image of a black gorilla in the bottom left-hand corner. During the video, **JOHNSON** rapped as follows: "Fuckin dropping dimes … that's that snitch shit; type of thing that get your whole team hit. Fuck that, I'm off that, catch me in all black."

45. In or about September 2012, **FAISON** and another individual directed a BGF member to conduct an armed robbery of a neighborhood drug dealer.

46. On October 31, 2012, in the 300 block of E. Lanvale Street, **FAISON** and another BGF member distributed cocaine and possessed $323 in U.S. currency.

47. On November 2, 2012, near the intersection of N. Milton and E. Biddle Streets, **HARVEY** distributed cocaine and possessed $169 in U.S. currency. After arresting **HARVEY** and advising him of his Miranda rights, police officers informed him that they had seen him selling drugs on a CCTV camera. **HARVEY** responded, "Shit, I didn't think those worked. You should put me on America's Dumbest Drug Dealers."

48.     On November 29, 2012, **BROWN** exchanged a series of text messages with a BGF associate, in which he stated that he had just obtained "drugs" and agreed to serve as an intermediary for a drug transaction involving marijuana.

49.     On December 6, 2012, **BROWN** sent a text message to a BGF associate, in which he stated, "the money is in the coke I'm tryin tell u."

50.     On December 19, 2012, in the 4800 block of Bowland Avenue, **FAISON** and another BGF member possessed with intent to distribute marijuana and possessed a loaded Smith & Wesson .45 caliber firearm (serial number TCC1459).

51.     Between February and November 2013, **JOHNSON** regularly paid gang dues and distributed cocaine base to a high-ranking member of BGF.

52.     On March 3, 2013, **BROWN** posted a photograph on his Facebook account for the purpose of enhancing his status within BGF and intimidating potential witnesses. In the photograph, **BROWN** was depicted wearing a sweatshirt with the words "Fcuka Rat" printed above a picture of a mouse caught inside a trap.

53.     On March 23, 2013, in the 2400 block of Greenmount Avenue, **HANDY** and another individual robbed Victim M.M. During the robbery, **HANDY** used a .38 caliber handgun to shoot Victim M.M. in the foot. In or about April 2013, after learning that Victim M.M. had provided information to police officers that led to **HANDY's** arrest, **JOHNSON** authorized Victim M.M.'s murder in his capacity as a leader of BGF.

54.     On March 31, 2013, **BROWN** exchanged a series of text messages with another individual, in which **BROWN** discussed purchasing a firearm for $550 from a third party.

55.     On April 3, 2013, **JONES** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a .380 caliber handgun.

56.    On April 6, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of powder cocaine.

57.    On April 6, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to pick up a quantity of marijuana that **JOHNSON** had instructed the individual to give to **BROWN**.

58.    On April 7, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin and powder cocaine.

59.    On April 8, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin.

60.    On April 10, 2013, **BROWN** exchanged a series of text messages with another individual, in which he told the other individual that he owed **BROWN** money for a quantity of cocaine that **BROWN** had provided to him on consignment.

61.    On April 16, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with .380 caliber ammunition.

62.    On April 17, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin.

63.    On April 21, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of powder cocaine.

64.    On April 22, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin. **BROWN** further agreed to provide the individual with a quantity of cocaine, with the understanding that the individual would deliver the cocaine to a third party.

17

65.    On April 26, 2013, in a residence located at 1716 Latrobe Street, **BROWN** and another BGF member possessed with intent to distribute cocaine and heroin. **BROWN** also possessed paperwork setting forth the rules and constitutions of BGF, as well as a letter from **FAISON** to **MCCANTS** that began with the salutation "Eusi Gyeedi Jamaa"—Swahili for Black Guerilla Family. **BROWN** also possessed a letter from **HARVEY**, in which **HARVEY** apologized for breaking the rules of BGF and stated as follows: "I should not have broken these laws because I am not bigger than J[.]  I should always live by my 55s and my oath and I know consequences could have been worst [sic] for me as a solider of Jamaa won't brake [sic] them again[.]" **HARVEY** concluded the letter by stating, "Long Live the Guerillas."

66.    On April 30, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin.

67.    On May 1, 2013, **BROWN** exchanged a series of text messages with another individual, in which he agreed to provide that individual with a quantity of heroin.

68.    On May 1, 2013, a BGF member stored three handguns—two .357 caliber handguns and one .22 caliber handgun—inside a residence located at 2466 Greenmount Avenue. At the time, the residence was occupied by at least one other BGF member and a BGF associate. Later on May 1, **BROWN**, took possession of the .22 caliber handgun that his fellow BGF member had left inside the residence.

69.    During the early morning hours of May 2, 2013, inside the residence located at 2466 Greenmount Avenue, a BGF member used a cellular telephone belonging to a BGF associate to place an outgoing call to **BROWN**, in which he informed **BROWN** that Victim M.M, the individual who had provided information to law enforcement regarding the robbery

and shooting committed by **BROWN**'s half-brother **HANDY**, was in the area of Cokesbury Avenue.

70.     On May 2, 2013, in the 600 block of Cokesbury Avenue, **BROWN** shot and killed Victim M.M. using a .22 caliber handgun.

71.     In the days following Victim M.M.'s murder, **BROWN** requested assistance from another BGF member in disposing of the .22 caliber handgun that he had used to kill Victim M.M. **BROWN** told the other BGF member that the handgun was "dirty" because he had used it to shoot a witness who had provided information to law enforcement regarding his half-brother, **HANDY**.

72.     On May 7, 2013, in the 200 block of E. 22nd Street, **JONES** shot and killed Victim Tr.W., a BGF member, as a result of an internal gang dispute. **JONES** killed Victim Tr. W. using the same 9 mm handgun that had been used in the fatal shooting of Victim Th.W. in the 300 block of E. 22nd St. on March 2, 2013.

73.     In the days following Victim Tr.W.'s murder, **JONES** confronted another individual in the presence of **JOHNSON** and accused that individual of "snitching." **JONES** told the individual, in substance, that s/he was lucky that there was no "paperwork" proving that s/he was a "snitch," because otherwise s/he would be in trouble.

74.     On May 12, 2013, **BROWN** exchanged text messages with a BGF associate, in which he agreed to sell the .22 caliber handgun that he had used to shoot Victim M.M. in the head for $250.

75.     On May 14, 2013, 12 days after **BROWN** killed Victim M.M., **HANDY** participated in a recorded jail call, in which he discussed the charges against him arising from his March 23, 2013 robbery and shooting of Victim M.M.  During the jail call, **HANDY** was

informed by the other individual, "ain't no case anyways ... yo is gone anyways ... who are you going against anyways."

76.     On May 29, 2013, in the 2100 block of Greenmount Avenue, **HARVEY** possessed with intent to distribute cocaine.

77.     On June 3, 2013, near the intersection of Charles and 20th Streets, a BGF member shot and killed Victim W.M. with a Ruger.357 Magnum handgun (serial number153-24886). Following the murder, the BGF member told **BROWN**, in the presence of at least one other BGF member, that he had killed Victim W.M. because of Victim W.M.'s involvement in the death of Victim Tr.W. on May 7, 2013.

78.     On June 4, 2013, **HANDY** participated in a recorded jail call with **HARVEY**, during which **HARVEY** informed **HANDY** that Victim W.M. had gotten "his motherfuckin' issue last night." Shortly thereafter, **HANDY** participated in another recorded jail call with **HARVEY**, during which **HARVEY** confirmed that Victim W.M. had been executed because of his involvement in Victim Tr.W.'s death. "Man he had to go," **HARVEY** said. "He had something to do with that."

79.     In the early morning hours of June 8, 2013, in the 300 block of W. Fayette Street, **HARVEY** shot Victim L.T. using a 9mm handgun. At the time of the shooting, Victim L.T. was engaged in a physical confrontation with **BROWN** and others outside the Mirage nightclub, where BGF members had gathered to celebrate **BROWN's** birthday.

80.     On June 8, 2013, in the area of Brentwood Avenue, **HARVEY** gave the 9mm handgun that he had used to shoot Victim L.T. to another BGF member.

81.     Later on June 8, 2013, in the area of 23rd Street, **HARVEY** re-enacted his shooting of Victim L.T. in the presence of **BROWN** and at least one other individual.

20

82.     On June 13, 2013, **HANDY** participated in a recorded jail call with **BROWN**, during which he asked **BROWN** to provide him with buprenorphine strips for redistribution inside the jail.

83.     On June 20, 2013, in a residence located at 319 E. 21st ½ Street, **BROWN** possessed with intent to distribute 51 grams of heroin and a quantity of cocaine.

84.     On June 29, 2013, **HANDY** participated in a recorded jail call with **HARVEY**, during which **HARVEY** explained that he had confronted **JONES** and other BGF members over an internal gang dispute. **HARVEY** told **HANDY** that he had "gripped up" and was "strapped"—that is, he was armed—at the time he confronted **JONES** and others. Later during the call, **HARVEY** and **HANDY** speculated as to who had provided information to law enforcement prior to **BROWN's** arrest for drug offenses on June 20, 2013. "Whoever it is," **HARVEY** said, "they better pray to God that shit don't get revealed."

85.     On July 2, 2013, **FAISON** called a known individual from a recorded jail telephone. The known individual told **FAISON** that a third individual had been arrested after Baltimore Police officers discovered a handgun in her house, and that the handgun belonged to another BGF member who was refusing to take the charge. **FAISON** stated that the handgun had previously been his. Later during the call, **FAISON** and the other individual speculated as to who had provided information to law enforcement prior to **BROWN's** arrest for drug offenses on June 20, 2013.

86.     On July 3, 2013, **BROWN** participated in a recorded jail call with **HARVEY**, during which **HARVEY** recounted his effort to confront **JONES** and other BGF members over an internal gang dispute. **HARVEY** explained, just as he had to **HANDY** five days earlier, that he had "gripped up"—that is, that he was armed—at the time he confronted **JONES** and others.

87.     On July 5, 2013, **BROWN** participated in recorded jail calls with multiple individuals, during which he expressed his displeasure with **HARVEY** for selling a handgun to one of **BROWN's** family members.  The handgun was recovered by law enforcement during the search of a college dorm room on July 3, 2013.

88.     On July 6, 2013, in the 1800 block of Barclay Street, **HARVEY** possessed with intent to distribute (and in fact distributed) cocaine.

89.     In or about the summer of 2013, near the intersection of 22nd Street and Guilford Avenue, **HARVEY** and two other BGF members attempted to shoot **JONES** in retaliation for **JONES'** murder of Victim Tr.W. on May 7, 2013.

90.     On August 5, 2013, **BROWN** participated in a recorded jail call with **JOHNSON,** during which **JOHNSON** agreed to provide **BROWN** with buprenorphine for redistribution inside the jail.  During the call, **JOHNSON** asked **BROWN** whether he was "on the regular phone."  When **BROWN** said yes, **JOHNSON** responded, "Oh—shit!"

91.     On October 5, 2013, in the 300 block of 24th Street, **JONES** shot Victim L.S. using a Ruger P345 .45 caliber handgun with an obliterated serial number.  **JONES** shot Victim L.S. because he believed, incorrectly, that Victim L.S. had been involved in the attempt on his life near the intersection of Guilford Avenue and 22nd Street during the summer of 2013. Following the shooting, **JONES** arranged for another individual to take custody of the firearm that was used to shoot Victim L.S.  In November 2013, **JONES** participated in multiple recorded jail calls in which he instructed the individual to dispose of the firearm.  On December 12, 2013, Baltimore Police officers recovered the firearm from a residence located at 4447 Pall Mall Avenue.

92.    On October 23, 2013, in the 3300 block of Cherryland Road, **BONDS**, a felon, possessed a loaded .357 Magnum Silver Ruger revolver.

93.    On October 31, 2013, in the 300 block of E. Lafayette Avenue, **HANDY** and another BGF member assaulted and robbed Victims R.J. and T.C.

94.    On November 6, 2013, **HARVEY** possessed a "prison shank," *i.e.*, a homemade knife, inside the Baltimore City Detention Center.

95.    On July 4, 2014, **MCCANTS** and another individual possessed 120 grams of marijuana inside the Western Correctional Institution in Cumberland, Maryland.

96.    In or about October 2015, after being acquitted of participating in a criminal gang and other offenses in the Circuit Court for Baltimore City, **JOHNSON** participated in the filming of a rap video designed to intimidate the witnesses in the state trial and discourage those who would cooperate with law enforcement against him.  During the video, **JOHNSON** rapped about two BGF members who had testified as prosecution witnesses in the state case.  While making hand gestures mimicking the firing of a gun, **JOHNSON** stated as follows: "Nigga Nod, you know what you did.  Weirdo.  Nigga Chris, you know what you did. Weirdo.  Niggas on the stand.  Niggas on the stand, like this.  Niggas crazy."

97.    On or about October 16, 2015, **JOHNSON** posted a photograph on his Instagram account depicting **BROWN** holding a cell phone with the words "Not Guilty" stamped across the front.  Shortly before the photograph was posted, **BROWN** had been acquitted of murder, but convicted of other offenses, following a jury trial in the Circuit Court for Baltimore City.  In a comment accompanying the photograph, **JOHNSON** referenced one of the witnesses who had testified against **BROWN**, and also against **JOHNSON** in a separate case.  Adjacent to the name of the witness, **JOHNSON** posted three "emojis," each of which depicted a cartoon rat.

98.     On November 5, 2015, **JOHNSON** posted a comment on his Instagram account—later deleted—in which he wrote, "Jama [sic]."

99.     In or about the fall of 2015, in the 2400 block of Greenmount Avenue, **JOHNSON** offered to sell an AR-15 assault rifle to another individual for $1,200 or $1,300.

100.    On or about November 19, 2015, in the 2400 block of Greenmount Avenue, **JOHNSON** and another BGF member distributed cocaine to a street-level drug dealer in the neighborhood.

101.    On November 23, 2015, **JOHNSON** posted a photograph on his Instagram account, in which he is depicted crossing his arms, revealing a tattoo of the word "Jamaa" on the outside of his left forearm.

102.    On November 26, 2015, **JOHNSON** posted a photograph on his Instagram account in which he is depicted gesturing towards the camera as if he were aiming a gun.  In comment accompanying the photograph, **JOHNSON** wrote: "We learned 2shoot 1st ask questions last thts how most how [sic] of ths so called gangstas last!!!"

103.    On December 3, 2015, an unidentified individual posted a YouTube video in which **JOHNSON** sought to enhance his status within BGF, and to intimidate potential rivals, by rapping about gun violence.  **JOHNSON** rapped as follows: "You know we riding with them birdies, nigga.  You fuckin' dead man if you in front the trigger.  30 shots; I ain't trippin' off a fuck nigga … 'cause I don't really trust niggas … and I won't hesitate to rush niggas … face up on the news, bitch, I ain't gotta tell you what I dos, bitch.  If there's two guns, then there's four clips.  And if there's four niggas, there's eight guns … when it's crunch time, the machine guns … I'm a squeeze these bitches 'til the F-E-Ds come."

104.    On March 2, 2016, **JOHNSON** exchanged a series of text messages with another individual, in which he agreed to provide that individual with 3.5 grams of cocaine for $225.

105.    On March 3, 2016, **JOHNSON** exchanged a series of text messages with another individual, in which he agreed to sell that individual a quantity of 30 mg oxycodone pills.

106.    On March 3, 2016, **JOHNSON** sent a text message to multiple individuals, in which he told those individuals that he had a quantity of 30 mg oxycodone pills for sale.

107.    On March 7, 2016, **JOHNSON** sent text messages to multiple individuals, in which he informed those individuals that he had 15 and 30 mg oxycodone pills for sale.

108.    On March 23, 2016, **JOHNSON** exchanged a series of text messages with another individual, in which he agreed to purchase a quantity of 15 mg oxycodone pills.

109.    On March 24, 2016, **JOHNSON** sent text messages to multiple individuals, in which he informed those individuals that he had 10 mg oxycodone pills for sale.

110.    On March 25, 2016, **JOHNSON** sent text messages to multiple individuals, in which he informed those individuals that he had 15 mg oxycodone pills for sale.

111.    On March 25, 2016, **JOHNSON** exchanged a series of text messages with another individual, in which he agreed to sell that individual a quantity of 15 mg oxycodone pills.

112.    On March 27, 2016, **JOHNSON** exchanged a series of text messages with another individual, in which he informed that individual that he had a quantity of 30 mg oxycodone pills for sale.

113.    On March 28, 2016, **JOHNSON** posted a comment on his Instagram account, in which he bragged of his ability to order the commission of violence and to offer compensation for the killing of witnesses. **JOHNSON** wrote as follows: "Got them shooter'$ on ur azz caus u

failed da mission? Ask me how im still here? Caus i paid attention!!!prayn 4my dwn fall gott

these haters snitchn,boy its money on ur head, agetta hater missin!!! … we bn gettn money on u

wierdos!!"

114.   On April 3, 2016, **JOHNSON**, a felon, exchanged a series of text messages with

another individual, in which he agreed to purchase a 9mm handgun in exchange for $300 and a

quantity of marijuana.   During this exchange, the other individual informed **JOHNSON** that he

expected to have some "stendos," *i.e.*, extended clips, for 9 mm and .40 caliber handguns

available for purchase the following week.

115.   On April 6, 2016, **JOHNSON** posted a video on his Instagram account, in which

he memorialized a recently-murdered BGF member.  Towards the end of the video, **JOHNSON**

stated, with respect to **FAISON** and **HUNTER**: "Free Roscoe. Free Dave—nigga my shooter

…"

116.   On April 7, 2016, **JOHNSON** exchanged a series of text messages with another

individual, in which he agreed to sell that individual a quantity of 15 mg oxycodone pills.

117.   On April 29, 2016, a BGF member posted a video on YouTube in which

**JOHNSON** sought to enhance his status within BGF, and to intimidate rivals and potential

witnesses,  by rapping about killing people while making gestures as though firing a gun.

**JOHNSON** rapped as follows: "I don't give a fuck what niggas they be talkin about.  I get

niggas shot just for running mouth … surround the corners, this nigga a goner, post him in front

of the shop, smoke him like marijuana, kill him in front of the shop, frankly he a goner … I will

run up on him and Glock him … you niggas can't flag 'round my block."

118.   On May 11, 2016, **MCCANTS** exchanged a series of text messages with another

BGF member, in which he agreed to provide the BGF member with $300 worth of marijuana on

consignment. The BGF member, in turn, agreed to repay **MCCANTS** after he sold the marijuana to customers. At the end of the exchange, **MCCANTS** warned the BGF member, "don't fuck up ya money."

119.    On June 21, 2016, **JOHNSON** posted a photo on his Instagram account depicting **BROWN** wearing a sweatshirt with the words "Fcuka rat" written above a picture of a mouse caught inside a trap. In a comment accompanying the photo, **JOHNSON** wrote: "Free my round coasta nostra!!! Young gangsta ly champ!!! #savage."

120.    On June 22, 2016, **JOHNSON** posted a comment on his Instagram account in which he wrote, "We filled Tha house wit more pistols. Tha more ,Tha better!!!"

121.    On June 26, 2016, **JOHNSON** exchanged a series of Instagram messages with another individual, in which **JOHNSON**, using the screen name "I feellyke john gotti!!!," asked the individual to provide him with .45 caliber ammunition.

122.    On June 27, 2016, **JOHNSON** posted a video on his Instagram account, in which he sought to intimidate rivals by threatening them with gun violence and pledging to follow the example of Howard Rice, an imprisoned former gang leader who was convicted of racketeering and drug-related charges in 2006. During the video, **JOHNSON** stated: "you bitch-ass niggas, yo, think throwing dirt on my name goin' be cool, yo, that shit ain't gonna get you out of a situation, yo, cause I be in you niggas' ass yo, like a wedgie, yo, stop fuckin' playin' me, yo, for real, this shit can get ugly, yo, and I'm out here, yo, thuggin' yo, late night, yo, goons on the steps, still gettin' wet, cars double parked, sticks in there, don't fuckin' talk to us, for real, yo, cause this situation, yo, that was cute, can get ugly, yo, for real, yo, I start Howard Rice-ing you niggas, yo ... 22s and shit like that, silencers, shit ..." In a comment accompanying the video, **JOHNSON** wrote: "Fed up!! Ima Howard rice [sic] 1of u pussies!!! #legend."

123.    On June 30, 2016, in the 1800 block of Barclay Street, **JOHNSON** possessed with intent to distribute cocaine. At the time of his arrest, **JOHNSON**, a felon, also possessed seven rounds of .45 caliber ammunition and $500 in counterfeit currency.

124.    On February 4, 2017, in the 400 block of E. North Avenue, **MCCANTS** attempted to murder Victim G.B., shooting him multiple times in the legs and back using a .40 caliber handgun.

125.    On February 5, 2017, inside a residence located at 5617 Pioneer Drive, **MCCANTS** attempted to hide the .40 caliber handgun that he had used to shoot Victim G.B. behind a wall underneath a bathroom sink.

126.    Between February 5 and February 9, 2017, **MCCANTS** participated in recorded jail calls with multiple individuals, in which he attempted to enlist those individuals' assistance in removing the .40 caliber handgun that he had used to shoot Victim G.B. and had hidden behind a bathroom wall at 5617 Pioneer Drive.

18 U.S.C. §1962(d)

## NOTICE OF SPECIAL SENTENCING FACTORS—COUNT ONE

From at least in or about 2005 through the date of this Superseding Indictment, in the

District of Maryland and elsewhere, the defendants herein,

**GERALD THOMAS JOHNSON,**
a/k/a "Geezy," a/k/a "Gzy Tha Prince,"
**WESLEY JAMAL BROWN,**
a/k/a "Shike White," a/k/a "Wes,"
a/k/a "West Coast," a/k/a "Coasta"
**DAVID ALBERT HUNTER,**
a/k/a "Lil Dave," a/k/a "Dave,"
**MONTEL HARVEY,**
a/k/a "Telly," a/k/a "Telephone," a/k/a "Big Head,"
**KENNETH JONES,**
a/k/a "K-Slay," a/k/a "Slay,"
**KENNETH LEE FAISON,**
a/k/a "Roscoe,"
**JOSEPH LAURENCE BONDS,**
a/k/a "Joe," a/k/a "Yo Gotti,"
**NORMAN TYRONE HANDY,**
a/k/a "Lil Norm," a/k/a "Norm," and
**MARQUISE MCCANTS,**
a/k/a "Digga,"

did knowingly and willfully combine, conspire, confederate, and agree with each other and with

others known and unknown to the Grand Jury to knowingly and intentionally distribute and

possess with intent to distribute 280 grams or more of a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1), (b)(1)(A) and 846.

## COUNT TWO
### (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 12 and 15 through 101 of Count One of this Superseding

Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From at least in or about 2005 through the date of this Superseding Indictment, in

the District of Maryland and elsewhere, the defendants herein:

**GERALD THOMAS JOHNSON,**
a/k/a "Geezy," a/k/a "Gzy Tha Prince,"
**WESLEY JAMAL BROWN,**
a/k/a "Shike White," a/k/a "Wes,"
a/k/a "West Coast," a/k/a "Coasta"
**DAVID ALBERT HUNTER,**
a/k/a "Lil Dave," a/k/a "Dave,"
**MONTEL HARVEY,**
a/k/a "Telly," a/k/a "Telephone," a/k/a "Big Head,"
**KENNETH JONES,**
a/k/a "K-Slay," a/k/a "Slay,"
**KENNETH LEE FAISON,**
a/k/a "Roscoe,"
**JOSEPH LAURENCE BONDS,**
a/k/a "Joe," a/k/a "Yo Gotti,"
**NORMAN TYRONE HANDY,**
a/k/a "Lil Norm," a/k/a "Norm," and
**MARQUISE MCCANTS,**
a/k/a "Digga,"

did knowingly and intentionally combine, conspire, confederate, and agree with each other and

with others known and unknown to the Grand Jury to distribute and possess with intent to

distribute 100 grams or more of a mixture of substance containing a detectable amount of heroin,

a Schedule I controlled substance; a quantity of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance; 280 grams or more of a mixture of

substance containing a detectable amount of cocaine base, a Schedule II controlled substance; a

quantity of a mixture or substance containing a detectable amount of oxycodone, a Schedule II

controlled substance; and a quantity of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C).

21 U.S.C. § 846

## COUNT THREE
### (Conspiracy to Commit Murder in Aid of Racketeering)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 13 and 15 of Count One of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     The organization known today as the BGF Greenmount Regime, including its leadership, membership, and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.     The organization known today as the BGF Greenmount Regime, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, acts involving murder, in violation of Maryland Code, Criminal Law §§ 2-201, 2-204, 2-205, and 2-206, and the Common Law of Maryland punishable pursuant to Maryland Code, Criminal Law §§ 1-201, 1-202, 2-201, 2-204, 2-205, and 2-206; acts involving robbery, in violation of Maryland Code, Criminal Law §§ 3-402 and 3-403, and the Common Law of Maryland; and acts involving dealing in controlled substances, in violation of 21 U.S.C. § 841; (distribution and possession with intent to distribute a controlled substance); and 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); and acts indictable under 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant); and 18 U.S.C. § 1513 (relating to retaliation against a witness, victim, or an informant).

4.     Between in or about April 2013 and May 2, 2013, in the District of Maryland and elsewhere, the defendants,

32

**GERALD THOMAS JOHNSON,**
**a/k/a, "Geezy"**
**a/k/a "Gzy Tha Prince," and**
**WESLEY JAMAL BROWN,**
**a/k/a "Shike White," a/k/a "Wes,"**
**a/k/a "West Coast," a/k/a "Coasta"**

for the purpose of maintaining and increasing position in the organization known today as the BGF

Greenmount Regime, an enterprise engaged in racketeering activity, did knowingly and willfully

combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to

murder Victim M.M., in violation of Maryland Code, Criminal Law §§ 2-201 and 2-204, and

punishable pursuant to Maryland Code, Criminal Law §§ 2-201, 2-204, and 1-202, and the

Common Law of Maryland, all in violation of 18 U.S.C. § 1959(a)(5).

18 U.S.C. § 1959(a)(5)

## COUNT FOUR
### (Murder in Aid of Racketeering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 13 and 15 of Count One, and Paragraphs 2 through 4 of

Count Three of this Superseding Indictment are re-alleged and incorporated by reference as

though fully set forth herein.

2.      On or about May 2, 2013, in the District of Maryland, the defendants,

**WESLEY JAMAL BROWN,**
**a/k/a "Shike White," a/k/a "Wes,"**
**a/k/a "West Coast," a/k/a "Coasta," and**
**GERALD THOMAS JOHNSON,**
**a/k/a "Geezy,"**
**a/k/a "Gzy Tha Prince,"**

for the purpose of maintaining and increasing position in the organization known today as the BGF

Greenmount Regime, an enterprise engaged in racketeering activity, feloniously, willfully, and

with deliberate premeditated malice, murdered Victim M.M., by using a firearm to shoot Victim

M.M., which crime constituted murder under Maryland Code, Criminal Law §§ 2-201 and 2-204,

and the Common Law of Maryland, all in violation of 18 U.S.C. § 1959(a)(1).


18 U.S.C. § 1959(a)(1)
18 U.S.C. § 2

## COUNT FIVE
### (Use, Carry, Brandish, and Discharge a Firearm During and In Relation to a Crime of Violence)

1.     The Grand Jury for the District of Maryland further charges that:

2.     On or about May 2, 2013, in the District of Maryland, the defendant,

### WESLEY JAMAL BROWN,
### a/k/a "Shike White," a/k/a "Wes,"
### a/k/a "West Coast," a/k/a "Coasta"

did knowingly, intentionally and unlawfully use, carry, brandish and discharge a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States—specifically, conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering, and murder in aid of racketeering, in violation of Title 18, United States Code, Sections 1962(d), 1959(a)(5), and 1959(a)(1)—as set forth in Counts One, Three, and Four of this Superseding Indictment, which are incorporated herein.

18 U.S.C. § 924(c)(1)(A)
18 U.S.C. § 2

## COUNT SIX
### (Possession with Intent to Distribute Cocaine Base)

The Grand Jury for the District of Maryland further charges that:

On or about June 30, 2016, in the District of Maryland, the defendant,

**GERALD THOMAS JOHNSON,**
**a/k/a "Geezy," a/k/a "Gzy Tha Prince,"**

did knowingly and intentionally possess with intent to distribute a quantity of a mixture or

substance containing a detectable amount of cocaine base, a Schedule II controlled substance.

21 U.S.C. § 841(a)(1)
18 U.S.C. § 2

36

## COUNT SEVEN
### (Possession of Ammunition by a Felon)

The Grand Jury for the District of Maryland further charges that:

On or about June 30, 2016, in the District of Maryland, the defendant,

### GERALD THOMAS JOHNSON,
### a/k/a "Geezy," a/k/a "Gzy Tha Prince,"

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess ammunition in and affecting interstate commerce, specifically, seven rounds

of Federal .45 caliber ammunition, in violation of Title 18, United States Code, Section 922(g)(1).


18 U.S.C. § 922(g)(1)

## <u>COUNT EIGHT</u>
### (Possession of a Firearm by a Felon)

The Grand Jury for the District of Maryland further charges that:

On or about February 4 and February 5, 2017, in the District of Maryland, the defendant,

### MARQUISE MCCANTS,
### a/k/a "Digga,"

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess a firearm in and affecting interstate commerce, specifically, one Ruger .40

caliber handgun, bearing serial number 34384459, in violation of Title 18, United States Code,

Section 922(g)(1).


18 U.S.C. § 922(g)(1)

## FORFEITURE ALLEGATIONS

1.      The United States hereby gives notice to the defendants that upon conviction of

the racketeering conspiracy set forth in Count One, the government will seek forfeiture, in

accordance with 18 U.S.C. § 1963, which requires any person convicted of an offense under 18

U.S.C. § 1962 to forfeit: (a) any interest the person acquired or maintained in violation of 18

U.S.C. § 1962; (b) any interest in, security of, claims against, or property or contractual right of

any kind affording a source of influence over any enterprise that the person has established,

operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. §

1962; and (c) any property constituting, or derived from, any proceeds that the person obtained,

directly, or indirectly, from racketeering activity, in violation of 18 U.S.C. § 1962.

2.      If any of the above-described forfeitable property, as a result of any act or

omission of the defendants;

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property that cannot be divided without
        difficulty

it is the intent of the United States, pursuant to 18 U.S.C. § 1963(m) to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

3.      The United States further gives notice that upon conviction of one or more of the

offenses set forth in Counts Two and Six of this Superseding Indictment, the defendants, shall

forfeit to the United States pursuant to 21 U.S.C. § 853, upon the conviction of an offense in violation of 21 U.S.C. §§ 841 or 846:

    a.   any property constituting, or derived from, and any proceeds obtained, directly or indirectly, as the result of the offense; and

    b.   any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense.

    4.     The United States further gives notice that upon conviction of one or more of the offenses set forth in Counts Five and Seven of this Superseding Indictment, the defendants, shall forfeit to the United States pursuant to 18 U.S.C. § 924(d) any firearms or ammunition possessed in violation of 18 U.S.C. § 922(g), as charged in this Superseding Indictment

    5.     Such property shall include, but shall not be limited to, a sum of money equal to the proceeds obtained, directly or indirectly, as the result of the violations of 21 U.S.C. § 846, as charged in Count Two of this Superseding Indictment, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained as a result of the conspiracy to violate the Controlled Substances Act, for which the defendants are jointly and severally liable.

    6.     If any of the property described above, as a result of any act or omission of the defendants:

    c.   cannot be located upon the exercise of due diligence;

    d.   has been transferred or sold to, or deposited with, a third party;

    e.   has been placed beyond the jurisdiction of the court;

    f.   has been substantially diminished in value; or

    g.   has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 924(d)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 1963
21 U.S.C. § 853
28 U.S.C. § 2461(c)

_Stephen M. Schenning PSM_
STEPHEN M. SCHENNING
Acting United States Attorney

A TRUE BILL

**SIGNATURE REDACTED**

Foreperson

Date: 9/20/17

41